## In re A. B. BAXTER & CO.

### In re BLITCH (two cases).

(Circuit Court of Appeals, Second Circuit. January 9, 1907.)

### Nos. 104, 107, 242.

1. GAMING—WAGERING TRANSACTIONS—SALES FOR FUTURE DELIVERY.

A transaction by which property is bought and sold for future delivery, and which is legitimate on its face, cannot be held void as a wagering contract because one of the parties understood and meant it to be so, but the proof must go further and show that such understanding was mutual.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Gaming, § 22.]

2. SAME—TRANSACTIONS WITH BUCKET SHOP—UNDERSTANDING OF PARTIES.

The probability that an intelligent and experienced business man who enters upon a course of speculative dealings with a bucket shop does so with the understanding that the purchases or sales are to be merely colorable is so strong as to amount to a presumption of fact, which is not overcome by his testimony to the contrary given in his own interest, nor by a recital in confirmation slips given on receipt of the orders that actual delivery was in all cases understood, which in itself indicated that it was inserted for some ulterior purpose.

Petition to Review Order of, and Appeal from, the District Court of the United States for the Southern District of New York.

F. M. Czaki and Fried & Czaki, for petitioner.
J. J. Adams, for bankrupt.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

PER CURIAM. The executors of Blitch and the alleged bankrupt have each appealed from an order of the court below allowing the claim of Blitch as a creditor, and adjudging the amount at $11,346. It is insisted on the part of the alleged bankrupt that the claim should have been disallowed in its entirety, and in behalf of the executors that a considerably larger sum should have been adjudged owing. The District Court referred it to a special commissioner to take the evidence in respect to the claim and report to the court with his opinion. The case presented is this:

Baxter & Co. was a New York corporation having its principal place of business in New York City, and having also branch offices in various parts of the country, including one at Savannah, Ga. Its ostensible business was that of a broker in the business of buying and selling securities and produce, but its real business was that of a "bucket shop," dealing with customers who deposited small margins and speculated upon the fluctations in the market prices. It received orders and purported to execute them at the market price, and credited or charged the account of the customer accordingly; but it executed the orders only upon its books. These orders were sent by wire from the office at which they were received to the principal office, and a confirmation slip was delivered to the customer, signed by Baxter & Co. These slips contained this clause:

"We receive no orders except with the understanding that the actual delivery of property bought or sold is in all cases contemplated and understood. It is further understood and agreed that on all marginal business the right is reserved to close transactions when the market value indicates an insufficiency of margin in our hands to prevent loss to us, without notice and at public or private sale."

Blitch resided in Georgia, and in January, 1903, opened a speculative account with Gray, the agent of Baxter & Co., at its branch office in Savannah. For three years previously he had had a speculative account with Murphy & Co., a concern carrying on a bucket shop at Savannah. He was a merchant, doing a business of forty or fifty thousand dollars a year, and postmaster of the village in which he lived. Between January and August 7th, Blitch gave the Savannah office numerous orders to buy and sell cotton, and some to buy mining shares, and received for each order a confirmation slip such as has been referred to. On the 7th day of August, 1903, a number of these orders were outstanding. The value of the property, at the market prices represented by the orders to purchase, was nearly $120,000, and of the property represented by his orders to sell was about $40,000. At the market prices, on the opening of business of that day, there would have been a margin in his favor of about $1,000. There was much fluctuation in the cotton market, and his orders were most of them for the purchase or sale of cotton for future delivery. He was informed by Gray that his account needed additional margin by four or five hundred dollars, and thereupon he gave Gray a check, and a note payable in the future, amounting together to $476.81, and received a receipt therefor. August 10th he was notified by Gray that he could not use the note, and more margin must be put up at once "or he (Gray) should have

to hedge the trades in September cotton and in Amalgamated Copper."
Blitch protested, but shortly after the market opened Baxter & Co.
closed some of the orders by a nominal sale of the September cotton
and the shares of Amalgamated Copper.   August 18th it closed the
rest of the orders except one for the purchase of 50,000 pounds of ribs,
and on September 1st it closed the order for ribs.   Baxter & Co. duly
notified Blitch of the closing of his orders at the respective times there-
of.   The market advanced subsequently, so that within the next 30 days
Blitch could have realized a large profit on his orders to purchase.

The special commissioner found as facts that Gray had received the
note given by Blitch as so much cash, and that at the time Baxter & Co.
closed the orders Blitch's customary margin was not exhausted.   He
also made the following findings:

"The evidence forces me to the conclusion that Mr. Blitch never expected
to receive and pay for the merchandise that he purchased, or to deliver the
merchandise he sold, but that his intention in each instance was to settle on
differences.   With much doubt I find as a fact that Baxter & Co. had rep-
resented to him that in every instance they actually executed each order he
gave them, and that he supposed Baxter & Co. were doing a legitimate broker-
age business and were actually carrying for him the merchandise he had di-
rected them to purchase or to sell."

As matter of law the special commissioner found that the relations
between Blitch and Baxter & Co. were the same as though the repre-
sentations made by it to Blitch, and believed by him, had been true;
that the acts of Baxter & Co. in closing the orders given by Blitch were
equivalent to a conversion of the property represented by the orders to
purchase; and that Blitch was entitled to recover as damages the high-
est value of the property intermediate the time of the conversion and
a reasonable time after he had been notified thereof.   He also found
that as to the cotton and the copper stock 15 days was a reasonable
time, and as to the ribs 30 days was a reasonable time.

It is contended for the alleged bankrupt that no recovery should have
been allowed Blitch for the conversion of the property which he had or-
dered Baxter & Co. to purchase, because his claim is founded merely
upon a breach of an agent's instructions in carrying out wagering con-
tracts.   If it was the understanding between Blitch and Baxter & Co.
that their dealings would be those ordinarily carried on between a cus-
tomer and a bucket shop, or that Baxter & Co. would not actually ex-
ecute the orders according to the custom of brokers, so that there would
be no future delivery of the property ordered to be purchased, the
transactions between them were in furtherance of a mere gambling
scheme, and a recovery could not be permitted.

It is too well settled to need any citation of authority that contracts
for the purchase of property to be delivered at a future day are not void
as wager contracts merely because the property is not in existence in the
hands of the seller and is to be subsequently acquired by him.   It is
equally well settled that a transaction which is on its face legitimate
cannot be held void as a wagering contract by showing that one of the
parties to it understood and meant it to be so.   "The proof must go
further and show that this understanding was mutual—that both par-
ties so understood the transaction."   Irwin v. Williar, 110 U. S. 499,

508, 4 Sup. Ct. 160, 28 L. Ed. 225; Bibb v. Allen, 149 U. S. 481, 492, 13 Sup. Ct. 950, 37 L. Ed. 819.   As a man cannot gamble with himself, and there must be two parties to a wager, it is not enough that Blitch never intended or expected that the property ordered should be delivered to him nor is it enough that Baxter & Co. never expected or intended to secure such a delivery by executing the orders to purchase. In Farnum v. Whitman, 187 Mass. 381, 73 N. E. 473, the court used this language:

"At common law, in order to render a contract void as a wagering contract, it must appear that both parties understood and agreed, expressly or impliedly, to the things which constituted it as matter of law a wagering contract. This does no rest on grounds peculiar to wagering contracts. The unexpressed or uncommunicated intention of one party to a contract is not binding upon the other party to the contract. In order to be binding, the intention must be common to both."

That this is the law of Georgia sufficiently appears by Forsyth Mfg. Co. v. Castelin, 112 Ga. 199, 37 S. E. 485, 81 Am. St. Rep. 28, where in an action by brokers it was contended that the transactions involved were dealings in fictitious "futures." The court held that transactions of that kind were not invalid unless it appeared "that neither of the parties contemplated an actual delivery of the goods, and that it was the intention of both that there should be no actual delivery, but on the day fixed for delivery there should be a settlement of their differences, based on the market value of the goods on that day."

This is a case where each party intended to engage in a series of wagering transactions, and where it is sufficiently plain that Baxter & Co. understood the intentions of Blitch. The real inquiry consequently is whether Blitch understood the intentions of Baxter & Co. The finding of the special commissioner, that Baxter & Co. had represented to Blitch that in every instance they actually executed the orders given them, was based upon the recital contained in the confirmation slips. But if Blitch did not rely upon these representations, the fact that they were made is not important. Blitch was examined as a witness before the special commissioner, and his testimony indicates that he was a man of keen intelligence and extensive business experience. We are unable to accept the conclusion of the court below, reached with "much doubt," that Blitch believed these representations. He was an experienced business man, and familiar with the business of speculating in futures. It is almost incredible that such a man should not have known that he was dealing with a bucket shop, or that he was not aware of the ordinary business methods of such a concern. According to common understanding the bucket shop "uses the terms and outward forms of the exchanges, but differs from the exchanges in that there is no delivery, and no expectation or intention to deliver or receive securities or commodities said to be sold or purchased." (See Standard Dictionary.)   Blitch not only testified that he was not aware that Baxter & Co. was operating a bucket shop, but he testified that he supposed that it was actually carrying the property covered by his orders.   It is impossible to contradict the testimony of a witness as to his state of mind by direct evidence, unless he has made impeaching state-

ments, and such testimony, where it is that of an interested party, is entitled to but little weight if it is inconsistent with the reasonable presumptions arising from circumstantial evidence. The probability that an intelligent man who enters upon a course of speculative dealings with a bucket shop does so with the understanding that the purchases or sales are to be merely colorable is so strong as to amount to a presumption of fact. It is quite incredible that Blitch should have believed that Baxter & Co. were "carrying," for the purposes of his speculation, $140,000 worth of property, or the evidence of title thereto, on the trifling margin of 1 per cent. The recital in the confirmation slips, upon which it is said he relied, was pregnant with information to an alert business man that Baxter & Co. was not doing business legitimately. It was such an unnecessary and unusual statement as to suggest at once that it was a precaution adopted by Baxter & Co. for its own protection in case the validity or legality of its transactions should be questioned. Its presence indicated that it was inserted for some ulterior purpose. Central Stock & Grain Exchange v. Board of Trade, 196 Ill. 396, 63 N. E. 740; Weare Commission Co. v. The People, 209 Ill. 528, 70 N. E. 1076. "Here are the very clausulæ inconsuetæ pointed out in Twyne's Case as the sure badges of that which they are intended to hide." Taylor v. Taylor, 8 How. (U. S.) 205, 12 L. Ed. 1040.

We are unable to doubt that each party understood the other, and that the implied understanding between them was, at the inception of and throughout their dealings, that their transactions should be those of the ordinary kind between customer and bucket shop proprietor. The courts ought not to indulge in any violent or improbable inferences from the facts to assist either of the parties to such dealings, or to differentiate their dealings from ordinary gambling transactions.

These conclusions render it unnecessary to consider any of the questions as to the amount of the recovery presented by the appeal of either party.

The order is reversed, with instructions to the court below to disallow the claim.